UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| MARCO, INC., a Minnesota Corporation, | ) ) ) | CIV. 11-4072-KES |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| ADVANCED SYSTEMS, INC., an Iowa Corporation; CHRISTINE M. BERGESON; WAYNE C. EWING; JIM E. LIEBSCH; MICHAEL R. LINTON; LORIN PITTS; and KENT REILLY, | ) ) ) ) ) ) ) ) ) | ORDER GRANTING PLAINTIFF'S AMENDED MOTION FOR A PRELIMINARY INJUNCTION |
| Defendants. | ) | |

Plaintiff, Marco, Inc., entered a bidding competition with defendant

Advanced Systems, Inc. (ASI) to purchase Best Business Products, Inc., a Sioux

Falls-based company. Marco won the bidding competition and purchased all of

Best's assets, excluding some antiques. After ASI lost the bidding competition, it

entered the Sioux Falls market and Marco filed a 15-count complaint against

ASI and defendants Christine M. Bergeson, Wayne C. Ewing, Jim E. Liebsch,

Michael R. Linton, Lorin Pitts, and Kent Reilly, all of whom are former Best

employees. Marco sought a temporary restraining order and preliminary

injunction. The court denied the temporary restraining order and set the

preliminary injunction hearing for June 21, 2011. Docket 50. The day before the

hearing, Marco filed an amended motion for a preliminary injunction and limited its requested relief to an order prohibiting ASI from using, possessing, or disclosing any of Marco/Best's confidential and proprietary information and contacting, soliciting, inducing, or attempting to induce any Best customer to terminate its relationship with Best. Docket 61.[1] ASI resists the amended preliminary injunction motion. The motion is granted.

## BACKGROUND

The pertinent facts to this order are as follows:

Betty Best owned and operated Best, an office equipment sales and service company, which has six offices in South Dakota. ASI is engaged in a similar business and maintains its principal place of business in Waterloo, Iowa. Marco is also engaged in a similar business and maintains its principal place of business in St. Cloud, Minnesota.

After Betty passed away, ownership of Best passed to her estate. Her estate's trustee, Jim Schoettler with Wells Fargo in Minneapolis, took control of Best. Schoettler created a new board of directors with Schoettler as Best's president. Schoettler also created an executive team that included Ewing and Reilly to manage Best's day-to-day operations. Schoettler eventually decided

---

[1] At the hearing, Marco orally moved for a preliminary injunction against Reilly, Best's former general manager, to prohibit him from violating his employment agreement containing restrictive covenants. Not only did Marco fail to provide Reilly with notice that it intended to move for a preliminary injunction against him, but Marco also failed to offer any evidence that Reilly has violated his employment agreement. The court denied Marco's oral motion for a preliminary injunction against Reilly at the hearing.

that Best should be sold and 100 percent of Best, excluding some antiques, would be for sale. Schoettler used a bidding system to solicit bids from potential buyers.

There were three serious bidders for Best, including Marco and ASI. On September 17, 2010, ASI and Best entered into a "Confidential Disclosure Agreement" (September NDA). Schoettler signed as Best's president and James Newcomb, ASI's President and CEO, signed for ASI. ASI later requested that Best and ASI enter into another "Non-Disclosure and Confidentiality Agreement," which ASI drafted. Newcomb and Schoettler signed the second agreement on December 7, 2010 (December NDA).

Betty Erhardt, ASI's Chief Financial Officer, engaged in due diligence for ASI during the bidding process. After reviewing Best's initial disclosures, Erhardt determined that she needed more information to complete due diligence. ASI requested additional information from Best, specifically customer information contained in Best's "E-Automate" program, a software program used by companies to manage their inventory, finances, service histories, and customer service records. ASI received a CD containing a complete, unredacted copy of Best's entire customer database and other confidential and proprietary information. ASI concedes that the CD contains confidential and proprietary information.

Erhardt testified that ASI returned the CD after Marco announced that it was the winning bidder for Best. Mitch Johnson at Best signed a certified mail

3

return receipt for the CD on April 28, 2011. At the hearing, however, Tim Griggs, ASI's Chief Operating Officer, admitted that he made a copy of the CD and retained possession of the CD in a sealed envelope, which he locked in an office drawer. Griggs was still in possession of the CD when he testified at the hearing.

Newcomb testified that if ASI did not win the bidding competition, ASI's Board of Directors had decided to independently enter the South Dakota market. ASI made active plans to enter the market. Newcomb also testified that hiring Best employees was part of ASI's plan to establish a South Dakota branch.

On April 15, 2011, Marco issued a press release announcing that it was acquiring Best's assets and planned to begin operations as of April 29, 2011.

On Monday, April 18, 2011, Ewing, a member of Best's executive team, generated two large reports, an equipment report and a contract profitability report, and backed up certain files from the "C" drive of his computer onto flash drives. The flash drives were not protected by a password.[2]

Ewing did not prepare the two reports in the ordinary course of his job duties at Best. Instead, Ewing testified that he produced the reports to prepare for a prospective job interview with Marco. But Marco never informed Ewing

---

[2] Marco provided a copy of these two reports to the court under seal. After reviewing the reports, the court agrees with Marco that the two reports contain highly confidential and proprietary information, including lists of all equipment that Best owns or has sold and contract profitability information for all of Best's customers.

that it would be interviewing him and Jennifer Mrozek, Marco's Chief Financial Officer, testified that Marco had no intention of hiring Ewing.

Ewing stated that he did not take the flash drives off of Best's property. But the very next morning, on April 19, 2011, Ewing and two other key Best employees met with ASI executives at a secret meeting in Albert Lea, Minnesota. When Ewing met with ASI on April 19, he was unaware that Marco was not going to hire him.

The April 19 Albert Lea meeting involved Reilly (Best's General Manager), Ewing, Doug Patrick (Best's Sales Manager), Newcomb, Don Hinckle (ASI's Service Manager), and Dave Quint (ASI's Vice President and General Sales Manager). The meeting took place in the restaurant section of an Albert Lea Hy-Vee grocery store.

Patrick testified that he heard about the April 19 meeting from Reilly and that the meeting was a secret. Ewing also testified that Reilly told him that the April 19 meeting was a secret.

The April 19 meeting lasted between forty-five minutes and one hour. During the meeting, ASI informed the three Best employees that ASI intended to enter the Sioux Falls market. According to Patrick, ASI stated that it wanted to hire good service technicians and sales representatives and expressed a special interest in hiring key Best personnel. ASI's executives also stated that ASI desired to roll Best's customer contracts over to ASI, and employees, such as Patrick, would receive a financial incentive for each contract that they converted from Best to ASI. The ASI executives also explained that ASI planned to open

5

offices in Sioux Falls, Aberdeen, and Watertown, which were all locations where Best had offices.

On April 20, Quint called Patrick and again told Patrick that he would receive a monetary incentive for every customer maintenance contract that Patrick could roll from Best to ASI. Quint also asked Patrick to identify and provide contact information of key Best employees. Patrick provided the names of Loren Pitts, Dan Haslehorst, Sean Falken, and John Rickarns [phonetic] to Quint.

On Thursday, April 21, ASI posted two employment openings on careerbuilder.com, one for sales representatives and one for service technicians. Dockets 44-1, 44-2. The ads were blind, meaning that ASI did not identify itself as the employer. ASI received 14 responses for sales representative and 61 responses for service technicians. Five people were hired, all former Best employees: Ewing, Bergeson, Liebsch, Linton, and Pitts.

Ewing applied through careerbuilder.com on April 22. Ewing learned from Hinkle on April 24 that he would be hired by ASI, but Ewing did not formally interview with ASI until April 28. Ewing resigned from Best on April 28.

While Ewing still officially worked for Best and knew that he would be hired by ASI, he attempted to recruit Craig Davis, a Best service technician with 25 years of experience to work for ASI. Davis testified that he was nervous about Marco taking control of Best and wanted to explore his options. On Tuesday, April 26, Ewing told Davis that he could go online and apply for a new job. Davis said he did not want to apply; he just wanted information about

6

salary and health insurance. On Wednesday, April 27, Davis met with Ewing at Ewing's home over breakfast to discuss working for ASI. Ewing told Davis that even though Davis was a service technician, he would be working in sales until ASI had an established sales base. Ewing also told Davis that he would receive a financial "spiff" for every contract that he successfully rolled over from Best to ASI.

Ewing pressured Davis to make a decision quickly. Ewing said he had to have Davis's response before Friday, April 29. Because Marco required its employees to sign non-compete agreements, Ewing needed Davis's answer before April 29, when he would become a Marco employee.

When Davis questioned Ewing about whether he would be in legal trouble for working for ASI, Ewing told Davis not to worry about it because legal counsel would be made available to assist with any issues. Davis did not accept a position with ASI. Davis testified that a number of years ago, a young technician left Best, took confidential information with him, and lured some of Best's customers away from Best. Davis did not want to engage in similar behavior and stated that he would feel "dirty" about soliciting Best's customers.

Haslehorst, a service technician in Best's Aberdeen, South Dakota, office, testified that Hinckle called him while he was working at Best, a few days after the April 21 job posting on careerbuilder.com. Hinckle received Haslehorst's contact information from Patrick. Hinckle informally offered Haslehorst a job. Haslehorst then filled out an application on careerbuilder.com on April 26. Hinckle formally offered Haslehorst the job on April 27. Hinckle, Haslehorst,

7

and Shawn Falken, another Best employee who received a job offer from ASI after Patrick provided Quint with Falken's contact information, met on April 28 to discuss working for ASI.

During the April 28 meeting, Haslehorst expressed his concerns about taking a job with ASI because ASI was not in the Aberdeen market. Hinckle told Haslehorst that he would cold call businesses and tell his former customers that if they rolled their services agreements from Best to ASI, Haslehorst could continue working as their service technician. Hinckle promised Haslehorst a financial incentive for every contract that he successfully rolled over from Best to ASI.

Hinckle told Haslehorst that he needed to make a decision quickly because as of Friday, April 29, Haslehorst would be a Marco employee and his non-compete agreement would be effective. During this process, Hinckle told Haslehorst not to tell anyone about the job offer.

Bergeson, a Best service technician of Canon copiers with 14 years of experience, learned about ASI through Ewing. She applied for a job through the blind careerbuilder.com ad on April 25. Hinkle called Bergeson that evening and the two discussed Bergeson working for ASI. Bergeson had a second interview with ASI on April 28 and was offered a job, which she accepted.

Liebsch was uncomfortable with Marco acquiring Best. He testified that after Betty passed away, he began looking for jobs. But the only time he applied for a job was through the careerbuilder.com ad in April of 2011. Quint called Liebsch, interviewed him, and offered him a job. Liebsch accepted ASI's job

offer. Because ASI is not doing business in Yankton, where Liebsch worked with Best, he is cold calling businesses in Sioux Falls with Bergeson.

Linton, a Best employee with 6 years of experience, was told on April 29 that he would not be hired by Marco. After Linton left Best on April 29, Liebsch called and told Linton to call Quint if he needed a job. Linton met with Quint around 3:30 or 4 p.m. on April 29. After a two-hour discussion, Quint hired Linton. Linton admitted that he saw Best's customer list before he left Best.

Pitts was a service technician at Best with 37 years of experience. Pitts was getting anxious about Marco taking over Best and told Davis about his concerns. On Thursday, April 28, Davis told Pitts about careerbuilder.com and that there was going to be a meeting that night. Pitts applied, was offered a job, and accepted employment with ASI on Thursday, April 28. As an ASI employee, Pitts cold called business with Quint and Linton.

Newcomb and Tammy Bedard, ASI's marketing director, described ASI's go-to-market plan, also called the door-to-door campaign, in the greater Sioux Falls area. ASI's go-to-market plan is to cold call or prospect[3] all businesses

---

[3] Newcomb testified that ASI is "prospecting" to all businesses in Sioux Falls and Brookings. During the prospecting process, the ASI employee introduces himself or herself to the business, asks which company currently services the business, and collects business cards. When asked whether prospecting is cold calling, Newcomb maintained that prospecting is different from cold calling. It appears that prospecting and cold calling involve the same process of soliciting a customer to sell him or her goods or services. *See* THE NEW SHORTER OXFORD 437 (Lesley Brown, ed., 5th ed. 1993) (defining cold call as to "make an unsolicited call to or on (a person) to sell them goods or services"). For simplicity, the court will refer to the process used by ASI to solicit new customers as cold calling.

located in the greater Sioux Falls area. The plan consisted of two phases. During the first phase, ASI employees who worked in Sioux Falls cold called all businesses in the Sioux Falls and Brookings areas. The second phase was a blitz where ASI employees from other states converged in Sioux Falls and Brookings and made cold calls to all businesses. Through this process, Newcomb learned that Best had about 14 percent of the market in Sioux Falls.

With the exception of Liebsch, whose sales territory as a salesman with Best was in Yankton, all of ASI's employees who were Best employees have solicited Best customers during the cold-calling process in the same sales or service territories where they worked while employed by Best.

Pitts, a service technician, was paired with Quint and Linton for the door-to-door campaign. Pitts testified that he knew his customers well and that they were loyal to him. Pitts visited Best's largest customer in Brookings, along with four other Best customers in Brookings. Pitts testified that sales were not his "thing" and that he mainly rode along on sales calls. Pitts was assigned to the Brookings area when he worked for Best.

While Bergeson repeatedly testified that she was a service technician and that she enjoyed working on Canon copiers, she went on sales calls as an ASI employee. During these cold calls, Bergeson told customers that if they switched contracts from Best to ASI that she could continue servicing their Canon copiers. Bergeson knew that she would receive a financial incentive for every contract she successfully rolled from Best to ASI.

10

Bergeson testified that she contacted about ten of Best's customers and one customer moved its contract to ASI. Liebsch estimated that ASI contacted at least 100 Best customers. Linton estimated that he has solicited at least 25 Best customers.

Newcomb testified that he has no intention of refraining from soliciting Best's customers or altering employees' territories to avoid Best customers. Mrozek testified that the employees leaving Best for ASI have hurt Best's goodwill. Patrick similarly testified that the five employees who left Best for ASI have negatively impacted Best's goodwill.

## DISCUSSION

When ruling on a preliminary injunction motion, the court considers four factors: (1) the likelihood of success on the merits; (2) the threat of irreparable harm to the moving party; (3) balancing this harm with an injury that a preliminary injunction would inflict on the other party; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). While no single factor is dispositive, *Calvin Klein Cosmetics Corp. v. Lenox Laboratories, Inc.*, 815 F.2d 500, 503 (8th Cir. 1987), the two most critical factors are the probability that the movant will succeed on the merits and whether the movant will suffer irreparable harm if the preliminary injunction is not granted. *Chicago Stadium Corp. v. Scallen*, 530 F.2d 204, 206 (8th Cir. 1976); *see also Sampson v. Murray*, 415 U.S. 61, 88 (1974) (reasoning that the Supreme "Court has stated that '[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.' "

11

(alteration in original) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959))).

## I.      Likelihood of Success on the Merits

On the likelihood of success on the merits factor, the court determines whether Marco has a "fair chance of prevailing" on the merits. *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003). "[A]t this stage of the litigation, [plaintiff] is not required to prove a mathematical (greater than fifty percent) probability of success on the merits." *Id.* (citing *Dataphase*, 640 F.2d at 113). " '[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing.' " *Id.* (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

Relevant to this order are counts three and four of Marco's complaint, which allege breach of contract claims against ASI for an alleged violation of the September and December NDAs. While the September and December NDAs are similar, it appears that the December NDA, which ASI drafted, provides broader protections against the disclosure of confidential information and solicitation of Best customers. The December NDA is the last contract entered into between Best and ASI. Thus, the court will limit the remaining discussion to the December NDA.

The December NDA has a choice of law provision: "This Agreement shall be governed by and construed in accordance with the laws of the state of Iowa."

December NDA ¶ 8, Docket 56-4 at 7. Because the parties have not alleged that a conflict exists between South Dakota and Iowa law on the restrictive covenants in the December NDA, the court will apply Iowa law in interpreting the December NDA.

### A.    Assignability

ASI disputes whether Marco can enforce the December NDA because the agreement was between Best and ASI and Marco was not a signatory to the December NDA. Marco responds that it succeeded to all of Best's contractual rights in its assets purchase agreement because it bought all "claims, causes of action, rights of recovery, refunds, rebates[,] deposits and rights of set off of any kind." Docket 56 at 16.

Schoettler testified that he was selling 100 percent of Best, excluding some antiques. Mrozek similarly testified that Marco was buying 100 percent of Best's assets, including Best's contractual rights. Thus, it appears that Marco intended to and believed it did purchase Best's contractual rights, including Best's rights contained in the December NDA. The issue remains, however, whether the December NDA can be assigned from Best to Marco.

Under Iowa law, a formal assignment of contractual rights is not necessary for an assignment to be valid. *See Cass Atl. Dev. Corp. v. Pellett*, No. 05-1569, 2006 WL 3313791, at *5, 725 N.W.2d 658 (Iowa Ct. App. Nov. 16, 2006) (table decision) (enforcing a contractual right to exercise an option of an acquired business even though the contract lacked an assignment clause (citing *Corp. Express Office Prods., Inc. v. Phillips*, 847 So. 2d 406, 414 (Fla. 2003)

13

(holding that the surviving corporation after a merger is assumed to have the right to enforce non-compete agreements exercised by the merged entity and "no assignment is necessary.")).

Other jurisdictions have similarly held that non-compete agreements are assignable. *See, e.g.*, *Public Op. Pub. Co. v. Ransom*, 148 N.W. 838, 839 (S.D. 1914) (reasoning that a contract in restraint of trade can be valid if it is "connected with and an incident of the sale of the good will of the business to which it relates."); *Guidant Sales Corp. v. George*, No. 01-1638, 2001 WL 1491317, at *6 (D. Minn. Nov. 19, 2001) (reasoning that a "non-compete agreement may be assigned 'ancillary to the sale of a business to protect the goodwill of that business.' " (quoting *Saliterman v. Finney*, 361 N.W.2d 175, 179 (Minn. Ct. App. 1985))). Because Marco's asset purchase agreement stated that Best was purchasing all of Best's contractual rights and an express assignability clause is not necessary, Marco has shown that a fair probability exists that the December NDA was assignable.

### B. Enforceability of the December NDA

Sections 2(e) and 2(f) of the December NDA are at issue here:

2. Neither party will, directly or indirectly, in any many [sic] whatsoever

. . .

(e) Induce or attempt to induce any vendor, customer, employee, sub-representative, or independent contractor or other party to terminate such relationship; or

(f) Use any Proprietary or Confidential Information to solicit any customer of the other party for the purpose of selling

14

or offering to sell such customers products or goods the same as or similar to the goods or products sold or offered for sale by the other party.

. . .

The foregoing restrictions (a) through (f) shall not apply with respect to any portion of the Proprietary Information which, as of this date, is in the public domain or which is disclosed to the public by a third party, which or who is not under a legal or contractual restriction with respect to such disclosure.

9.   The restrictions contained in the Agreement shall survive for a period of two (2) years from the date hereof.

Docket 56-4 at 5.

In its amended motion for a preliminary injunction, Marco seeks to prohibit ASI from using, possessing, or disclosing any of Marco/Best's confidential and proprietary information and contacting, soliciting, inducing, or attempting to induce any Best customer to do business with ASI or cease doing business with Best/Marco. Docket 61. Marco's requests conform to the language contained in sections 2(e) and 2(f).

"When interpreting a written contract, the court determines the intent of the parties from the plain language of the instrument itself." *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 439 (Iowa 2008) (citing *Metro. Sports Facilities Comm'n v. Gen. Mills, Inc.*, 470 N.W.2d 118, 123 (Minn. 1991)). "When a contractual provision is clear and unambiguous, courts should not rewrite, modify, or limit its effect by a strained construction." *Id.* (citations omitted).

In section 2(e), ASI and Best agreed that neither company would induce or attempt to induce the other company's customers to terminate their

15

relationships. ASI alleges no ambiguity and the court finds no ambiguity in this prohibition. In section 2(f), ASI and Best agreed that neither company would use any proprietary or confidential information to solicit the other company's customers to sell the same or similar goods or products offered for sale by the other company. ASI alleges no ambiguity and the court finds no ambiguity in this prohibition.

While the plain language of sections 2(e) and 2(f) of the December NDA is clear, because the sections contain restrictive covenants, the court must determine if the sections meet Iowa's law on the enforceability of restrictive covenants. In analyzing the enforceability of an employee-employer restrictive covenant, the Iowa Supreme Court adopted the Restatement (Second) of Contracts § 188 on restrictive covenants. *Iowa Glass Depot, Inc. v. Jindrich*, 338 N.W.2d 376, 381 (Iowa 1983) (reasoning that "[o]ur rule is analogous to the Restatement rule" (citing Restatement (Second) of Contracts § 188(1))); *see also Moore Bus. Forms, Inc. v. Wilson*, 953 F. Supp. 1056, 1062 (N.D. Iowa 1996) (articulating the same test). Because the Iowa Supreme Court has looked to the Restatement (Second) of Contracts regarding the enforceability of restrictive covenants in the employee-employer relationship, the court assumes the Iowa Supreme Court would also look to the Restatement (Second) of Contracts with regard to the enforceability of other restraints on trade.

Section 188(1) of the Restatement (Second) of Contracts provides in pertinent part:

16

(1) A promise to refrain from competition that imposes a restraint that is ancillary to an otherwise valid transaction or relationship is unreasonably a restraint of trade if

    (a) the restraint is greater than is needed to protect the promisee's legitimate interest, or

    (b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public.

Restatement (Second) of Contracts §§ 188(1)(a) and (b). Ancillary promises are promises that impose restraints that are ancillary to a valid transaction or relationship. *Id.* at § 188(2). While subsection (2) lists three examples of ancillary promises, according to the comments to the Restatement, that list is not exhaustive and other courts have enforced restraints as ancillary to additional types of transactions or relationships, including an agreement by a potential purchaser of a business not to use confidential information to compete with the current owner. *Id.* at cmt. c, referring to *Island Air, Inc. v. LaBar*, 566 P.2d 972 (Wash. Ct. App. 1977).

According to § 188(1), Marco must show, by a fair probability, that it will succeed on the merits in establishing that (1) the restrictions in the December NDA are reasonably necessary for the protection of Marco's business; (2) the covenants are not unreasonably restrictive of ASI's rights; and (3) the covenants are not prejudicial to the public interest. *See, e.g.*, *Jindrich*, 338 N.W.2d at 381 (relying on § 188 to formulate a similar three-part test for employee-employer restrictive covenants); *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 760-61 (Iowa 1999) (same).

17

Under the first factor, a portion of Marco's business is sales, and, as a dealership, Marco relies heavily on Best's customer lists and customer goodwill to be a profitable business. The restrictions in sections 2(e) and 2(f) appear to be reasonably necessary for Marco's business.

Under the second factor, the covenants contained in sections 2(e) and 2(f) are not unreasonably restrictive of ASI's rights. The covenants expire on December 7, 2012, according to paragraph 9 of the December NDA. Newcomb testified that Best only has a 14 percent market share of the businesses in Sioux Falls, so the covenants appear to not unreasonably restrict ASI's right to fairly compete with Marco. Furthermore, ASI drafted the December NDA and had every right to modify the language as it believed was necessary to allow it to compete in the marketplace if ASI was not selected as the winning bidder.

The third factor, the public interest, is also met. "In the case of a sale of a business . . . the likely injury to the public may be too great if it has the effect of removing a former competitor from competition." Restatement (Second) of Contracts § 188 cmt. c. Not only was ASI not a competitor in the South Dakota market before Marco acquired Best, but ASI will not be completely removed from competition if the court enforces the December NDA. ASI will be free to solicit the remaining 86 percent of businesses in the greater Sioux Falls area and other South Dakota businesses that are not Best customers.

ASI, citing *Joynt v. Wilson Trailer Co.*, No. 99-0478, 2000 WL 766126 (Iowa App. Ct. June 14, 2000), argues that Iowa applies a fairness standard for

18

restrictive covenants when the covenant is between two corporate entities. In *Joynt*, the Iowa Court of Appeals reasoned that "[i]n the sale-related covenants not to compete cases we do not apply a 'strict construction,' but do hold the contract, being in restraint of trade and personal liberty, should not be construed beyond its fair import." *Id.* at *2 (citing *Thomas v. Thomas Truck & Caster Co.*, 228 N.W.2d 52, 55 (Iowa 1975)).

Even if a fairness standard is created, the restrictive covenants meet that standard. The plain language of sections 2(e) and 2(f) is clear and fair. Because ASI received highly confidential and proprietary information about Best during the bidding process, it is fair that ASI not be allowed to solicit Best's customers or use Best's confidential information to gain a competitive edge.

Marco has shown by a fair probability that sections 2(e) and 2(f) in the December NDA meet Iowa's enforceability rules for a restrictive covenant. Marco must next demonstrate that it has a fair chance of succeeding on its breach of contract claims involving sections 2(e) and 2(f).

## C.  Breach of Sections 2(e) and 2(f)

While recruiting former Best employees to work for ASI, ASI promised the employees that if they were able to successfully roll contracts from Best to ASI, the employee would receive a financial incentive in addition to his or her normal compensation. ASI even had service technicians such as Bergeson and Linton solicit Best customers and tell Best customers that if they terminated their

service contracts with Best and became ASI customers, then Bergeson and Linton could continue to work as their service technicians.

ASI has solicited Best's customers. Former Best employees offered varying numbers of how many Best customers have been contacted ranging from 25 to 100. But all five of Best's former employees who now work for ASI testified that they have cold called Best customers. Newcomb admitted that part of ASI's plan to enter the Sioux Falls market is to solicit all businesses in the greater Sioux Falls area, including Best customers. Newcomb also stated that he has no intention of limiting ASI's go-to-market plan to soliciting only non-Best customers. Marco has shown by a fair probability that it will succeed on the merits that ASI breached section 2(e) of the December NDA by soliciting Best's customers.

Regarding Best's confidential and proprietary information, Marco presented evidence that ASI has Best's confidential information and may be using that information to solicit Best's customers. During the bidding process, Erhardt requested additional information from Best. Erhardt received a CD containing unredacted information about Best's customers and contract profitability. Griggs made a copy of the CD and retained it, even after Erhardt returned her copy and after Marco closed on its acquisition of Best. This information has been available to ASI to use to solicit Best's customers.

Moreover, Ewing generated two large reports containing highly confidential information on the afternoon of April 18. Ewing was not asked to

prepare these reports by Best or Marco and did not prepare these reports during his normal course of duties. Ewing testified that he reviewed the information contained in these reports. The very next morning, Ewing met with ASI executives during a secret meeting in Albert Lea and discussed working for ASI. Marco may be able to show that Ewing used this information to either secure a job with ASI or to more effectively target Best customers or both. Thus, Marco has shown that a fair probability exists that ASI breached sections 2(e) and 2(f) of the December NDA. The probability of success on the merits factor weighs heavily in favor of granting the preliminary injunction.

## II.     Irreparable Harm

There is a threat of irreparable harm to Marco if ASI is allowed to continue its activities. Marco heavily relies on Best's customer lists and customer goodwill to be a profitable business. In the sales business, a customer list is a valuable asset and provides a business advantage over competitors. *See, e.g., Walling Chem. Co. v. Bigner*, 349 N.W.2d 647, 650 (S.D. 1984) (reasoning that a customer list "provides a business advantage over competitors who lack the information . . . .").

"Loss of intangible assets such as reputation and goodwill can constitute irreparable injury," because those items are not readily compensable by monetary damages. *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) (citing *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 625 (8th Cir. 1987)). Because the loss of customer goodwill is difficult to compensate,

courts find that the irreparable injury prong of the preliminary injunction test is met if a valid restrictive covenant is breached. *N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir. 1984) ("If the noncompete agreements are valid, then we think an irreparable injury has been shown.").

Marco purchased Best's goodwill. Marco presented evidence that Best's goodwill is currently being threatened and will continue to be threatened by ASI through ASI's solicitation of Best customers. It will be difficult, if not impossible, for the court to adequately compensate Marco with monetary damages if it suffers a loss of goodwill through ASI's actions.

ASI also possesses confidential information in the form of customer lists and product placement lists. ASI could further harm Marco by using this information to solicit Best's customers.

Newcomb testified that he has not done anything to prohibit ASI's employees from contacting Best's customers or using the customer information that they possess in soliciting Best's customers. ASI has no intention of voluntarily ceasing its actions. Thus, Marco has shown a threat of irreparable harm and this factor weighs in favor of granting the preliminary injunction.

## III.    Balance of the Harms

The balance of the harms factor requires the court to determine and then balance the harms that would result in the following scenarios: (1) if the court improperly denied the preliminary injunction because Marco prevailed on the merits; and (2) if the court improperly granted the preliminary injunction

22

because ASI prevailed on the merits. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284 (4th Cir. 2002) ("[W]hile cases frequently speak in the short-hand of considering the harm to the plaintiff if the injunction is denied and the harm to the defendant if the injunction is granted, the real issue in this regard is the degree of harm that will be suffered by the plaintiff or the defendant if the injunction is ***improperly*** granted or denied."); *Am. Hosp. Supply Corp. v. Hosp. Prods., Ltd.*, 780 F.2d 589, 594 (7th Cir. 1986) (announcing a similar test); *see also Hillerich & Bradsby Co. v. Christian Bros., Inc.*, 943 F. Supp. 1136, 1142 (D. Minn. 1996) (balancing the harms by looking at what the harm to the defendant would be if the injunction were "improperly granted").

If the court improperly denied the preliminary injunction motion, Marco's competitive place in the copier sales and service industry would be diminished, and its confidential information could be used to undercut Marco's competitive nature. Marco would then be denied adequate legal and equitable remedies because of the difficulty in accurately calculating damages resulting from the loss of customer goodwill. If the court improperly granted the preliminary injunction, ASI will have been wrongly prevented from competing against Marco and partaking in a valid business venture to the extent such activity is allowed by the December NDA.

On the one hand, any potential harm to ASI is less than the potential harm to Marco. If ASI improperly uses or discloses Marco's confidential information or otherwise decreases Marco's customer base by competing with

23

Marco in violation of the December NDA, it will difficult, if not practically impossible, for the court to return the improperly disclosed or utilized information to being confidential and secure.

On the other hand, the potential harm to ASI is greater than the harm to Marco because the Sioux Falls branch of ASI is a new office. "Interfering with a new business is more likely to cause irreparable harm than interfering with an established business like [Marco] . . . because an established business is more likely to withstand a financial setback." *Howard Venture LLC v. Lively*, No. 10-4072-KES, 2010 WL 2595276, at *2 (D.S.D. June 23, 2010). ASI's South Dakota office, however, is not a completely new, independent business, but rather a branch office of a larger company that has offices in Waterloo, Cedar Rapids, Fort Dodge, Dubuque, Mason City, Davenport, and Spencer, Iowa. Furthermore, ASI will only be prevented from competing with 14 percent of the businesses in the Sioux Falls market and other South Dakota businesses that are currently Best customers. A loss to ASI's Sioux Falls office will likely neither bankrupt ASI nor cause irreparable harm to ASI.

The denial of the preliminary injunction will infringe on Marco's contractual rights under the December NDA, but granting the injunction will not unfairly infringe on ASI's right to compete. The balance of the harms factor tips in favor of granting the preliminary injunction.

24

### IV.   Public Interest

The public has an interest in ensuring that contractual agreements are enforced within the confines of the law because "there is no public policy or rule of law which condemns or holds in disfavor a fair and reasonable" restrictive covenant. *Dental Prosthetic Servs., Inc. v. Hurst*, 463 N.W.2d 36, 38 (Iowa 1990). If refusing to grant the preliminary injunction would allow the parties to an agreement "to conduct themselves in a manner directly contrary to the express terms of the agreement," then the court will grant the preliminary injunction. *Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1026 (8th Cir. 1992). If "noncompete agreements are valid, the public interest calls for their enforcement." *Swindle*, 724 F.2d at 710; *see also Bradley Grain Co. v. Peterson*, 267 N.W.2d 836, 839 (S.D. 1978) (reasoning that the law has a "traditional interest in protecting the expectations of the parties," and abhors "any unjust enrichment."). Moreover, there is also a public interest in "fair competition by protecting confidential and secret information . . . ." *1st Am. Sys., Inc. v. Rezatto*, 311 N.W.2d 51, 57 (S.D. 1981) (citation omitted).

But courts must also "consider the broader economic implications" when determining whether to grant a preliminary injunction. *Calvin Klein Cosmetics*, 815 F.2d at 505. There is a "strong public interest in lowest possible prices," avoiding monopolies, and "in encouraging, not stifling, competition." *Id.* (citing *Smith v. Chanel, Inc.*, 402 F.2d 562, 566 (9th Cir. 1968)). Consumer choice is a public interest. *Gen. Motors Corp. v. Harry Brown's LLC*, 563 F.3d 312, 321 (8th

Cir. 2009) (citation omitted). In determining the public's interest in competition, the court also considers the direct economic cost to the competitor, such as how much merchandise is in the pipeline. *Dakota Indus., Inc. v. Ever Best Ltd.*, 944 F.2d 438, 441 (8th Cir. 1991).

Marco seeks to prohibit ASI from using any of Best/Marco's confidential information and soliciting any of Best's customers. Marco has made the threshold showing for a preliminary injunction that it has a fair probability of succeeding on its breach of contract claims involving sections 2(e) and 2(f) of the December NDA. Because the December NDA appears to be enforceable, the public has an interest in its enforcement. While the public has an interest in competition and lower consumer prices, ASI does not currently have an established presence in South Dakota and will not lose merchandise currently in its pipeline for the South Dakota market. Thus, the public interest factor weighs slightly in favor of granting the preliminary injunction.

## CONCLUSION

Marco seeks a preliminary injunction to prohibit ASI from using, possessing, or disclosing any of Best/Marco's confidential or proprietary information and to prohibit ASI from contacting, soliciting, inducing, or attempting to induce any customer of Best to do business with ASI. After considering all four factors, the court finds that Marco has shown it has a fair chance of succeeding on the breach of contract claim and the preliminary injunction is granted. Accordingly, it is

ORDERED that plaintiff's amended motion for preliminary injunction (Docket 61) is granted.

IT IS FURTHER ORDERED that defendant Advanced Systems, Inc. and any of its employees and/or agents are prohibited from using, possessing, or disclosing any of Marco/Best's confidential information.

IT IS FURTHER ORDERED that defendant Advanced Systems and any of its employees and/or agents are prohibited from contacting, soliciting, inducing, or attempting to induce any customer of Best Business Products (to the extent that such customer was a customer of Best Business Products as of December 7, 2010) to do business with Advanced Systems, Inc. or cease doing business with Marco/Best until a final decision has been issued in this case or until December 7, 2012, *see* Docket 56-4 at ¶ 9 (stating that the December 7, 2010, NDA is effective for two years), whichever occurs first. For purposes of clarification, ASI may continue its cold-call operation, but known Best customers should not be contacted and when a potential customer discloses that it has either a product under contract with Best or a service contract with Best, all contact by ASI with that customer should immediately cease.

Dated July 13, 2011.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE

27